## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **SHARONDA M. MEREDITH,** | ) | **CASE NO. 3:14CV416** |
| | ) | |
| **Plaintiff,** | ) | **UNITED STATES MAGISTRATE** |
| | ) | **JUDGE GEORGE J. LIMBERT** |
| **v.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN[1],** | ) | **MEMORANDUM OPINION & ORDER** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Sharonda M. Meredith ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's case with prejudice.

## I.     PROCEDURAL AND FACTUAL HISTORY

Plaintiff challenges her application for SSI filed on July 8, 2010 alleging disability since July 1, 2008 due to manic depression. ECF Dkt. #13, Transcript of proceedings ("Tr.") at 73-74, 196-200. The SSA denied Plaintiff's application initially and on reconsideration. *Id.* at 63-84, 89-91, 99-113. Plaintiff requested an administrative hearing, and on August 28, 2012, the ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 35-61. On September 20, 2012, the ALJ issued a Decision denying benefits. Tr. at 25-32. Plaintiff appealed the Decision, and on December 24, 2013, the Appeals Council denied review. Tr. at 1-15.

On February 24, 2014, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On August 29, 2014, the parties consented to the jurisdiction of the undersigned. ECF Dkt. #15. On November 3, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #18. On January 2, 2015,

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Defendant filed a brief on the merits and on January 16, 2015, Plaintiff filed a reply brief.  ECF Dkt. #s 20, 21.

## II.  SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from depressive disorder, intermittent explosive disorder, schizoaffective disorder, and alcohol abuse, which qualified as severe impairments under 20 C.F.R. § 416.920(c).  Tr. at 23. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. § 416.920(d), 416.925 and 416.926 ("Listings").  *Id*. at 23-25.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations:  simple, routine repetitive tasks; a work environment free of fast-paced production requirements with only simple, work-related decisions, with few, if any, workplace changes, no public interaction and no more than occasional and non-intensive interaction with coworkers or supervisors. Tr. at 25. The ALJ ultimately concluded that Plaintiff could perform her past relevant work as an auto detailer with the RFC that he determined.  *Id.* at 27.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.      If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.      If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ

may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V. RELEVANT MEDICAL HISTORY

Since Plaintiff's assertions of error concern the ALJ's decision as to her mental health, the Court will limit Plaintiff's medical history to her mental health treatment.

On October 21, 2009, Plaintiff voluntarily presented to Harbor Behavioral Health ("Harbor") for an evaluation. Tr. at 331. She was described as guarded and indicated that she did not like to answer questions and did not like for people to "pick her brain." *Id.* Plaintiff began getting up and pacing around the room within ten minutes of beginning the assessment and she reported that she was depressed, she did not get dressed unless she was going to leave the house, she tended to isolate herself, she had no appetite or motivation, she became angry easily, she had fatigue and insomnia, and she yelled at people. *Id.* at 331-32. She further indicated that she had anger toward others and herself because of her depressive symptoms and a lack of sleep. *Id.* at 332. She reported that she has hit walls and she "went off" on people. *Id.* Plaintiff noted that her depression began when she left her husband for a woman and after she had a partial hysterectomy. *Id.* at 331. She coped with her symptoms by listening to music, drinking beer and smoking cigarettes. *Id.*

Plaintiff reported that she got married when she was sixteen but divorced in 2006 and she has three sons, ages 14, 10 and 8. Tr. at 331. She completed up through the ninth grade in school. *Id.* at 332. She identified her only support as her mother and she indicated that she was not working and was living off of the child support for her children. *Id.* at 331.

Plaintiff indicated that she had no prior history of mental or emotional disorders, but she did attempt suicide after she left her husband and began having a relationship with a woman. Tr. at 331. She attempted to overdose on Motrin. *Id.* at 332. Plaintiff explained that she was evaluated after the suicide attempt and the hospital determined that she did not need a follow-up, but she was given a list of mental health agencies if she chose to use them in the future. *Id.* at 331.

Ms. Ruetz, the evaluator, found that Plaintiff's thought content was appropriate, her thought process was blocked, she had impaired speech and excessive motor skills, with average intellect, normal orientation, partially present insight, impaired judgment and normal memory. Tr. at 332.

Plaintiff indicated that she wanted a female counselor but she did not want to talk to anyone at the time because she was not ready to do so.  *Id.* at 333.  Plaintiff was diagnosed with major recurrent moderate depressive disorder, nicotine dependence and alcohol abuse.  *Id.*

On November 6, 2009, Advanced Practice Registered Nurse ("APRN") David Bingham conducted an initial psychiatric evaluation for Harbor where Plaintiff reported that she was not sleeping well for several months, she had increased agitation, unintentional loss of 6 inches from her waist, depression, and isolation.  Tr. at 335.  She indicated that she has had episodes of rage where she lost control and destroyed property.  *Id.*  She reported her past suicide attempt and some intrusive suicidal thoughts with no action taken on them.  *Id.*  Plaintiff stated that she drank beer five days per week and she felt that her home with her three sons was not safe as she had been robbed twice.  *Id.*  APRN Bingham described Plaintiff as alert and guarded, with no abnormal motor activity, normal speech, depressed mood, intact memory, impaired concentration and memory, logical thought form,  paranoid delusional content, and fair insight and judgment.  *Id.* at 336-338.  He diagnosed Plaintiff with major depressive disorder, recurrent and moderate, intermittent explosive disorder, and alcohol abuse.  *Id.* at 338.  APRN Bingham prescribed Celexa, Lithium and Trazodone.  *Id.* at 339.

On November 17, 2009, Plaintiff presented for medication management at Harbor and APRN Dewey noted Plaintiff's report that she was not doing well taking the medications daily as prescribed.  Tr. at 340.  APRN Dewey discontinued the Lithium, added Risperdal for mood instability, added Vistaril, and increased the Trazadone dosage.  *Id.*  She also referred Plaintiff to a therapist.  *Id.*  Her mental status examination of Plaintiff reported all normal results.  *Id.* at 341.

Plaintiff treated with Licensed Social Worker ("LSW") and Licensed Professional Clinical Counselor ("LPCC") Patricia Paul on November 24, 2009 at Harbor.  Tr. at 344.  Ms. Paul reported that Plaintiff's behavior/perception was guarded and her mood/affect was appropriate.  *Id.*   Ms. Paul noted that Plaintiff reported becoming angry very easily with angry outbursts and she had volatile relationships with women as she reported throwing a brick at one woman's car and and she kicked in the door to another woman's apartment.  *Id.*  Ms. Paul encouraged Plaintiff to take

responsibility and learn to control her anger and Plaintiff expressed reluctance for treatment and medication. *Id*.        On January 6, 2010, Plaintiff presented to Mark Hammerly, Ph.D for an agency-requested psychological evaluation.  Tr. at 372.  Plaintiff brought in empty prescription bottles of all of her medications and indicated that she needed refills.  *Id*. at 373.  Dr. Hammerly noted that it looked like she had been off of her medications for at least one month.  *Id.*  Plaintiff reported that she was going to counseling, but it was a struggle because she did not want to get out of bed.  *Id*. at 373-374.  She also indicated that she was trying to stop drinking alcohol, of which she was drinking several forty-ounce bottles per day for the last year but she had stopped for the last week or two.  *Id.* at 374.

Plaintiff reported that her most recent job was in a factory in 2008 or 2009 but she quit after one day because she did not want to leave her room.  Tr. at 374.  Her longest job was for 2 years working as a car porter until the dealership downsized.  *Id.*  Plaintiff reported that she had no problems getting along with others on the job or problems with work speed, quality or understanding.  *Id*.

Dr. Hammerly found that Plaintiff's mood seemed normal and her affect was broad and reactive.  Tr. at 374.  He noted that Plaintiff had no ruminations about suicide or homicide, she had no elevated mood or irritability or other manic traits.  Id. at 375.  He did observe psychomotor agitation, but no signs of anxiety, panic attacks, hallucinations, paranoia, or other somatic concerns.  *Id.*  Dr. Hammerly noted that Plaintiff was oriented and had grossly intact mental control, concentration and memory.  *Id*.  He estimated her intellectual functioning to be in the low borderline range.  *Id.*  He also found that Plaintiff had sufficient information, judgment and common sense reasoning ability to live independently and to make important decisions concerning her future.  *Id*. at 376.  He opined that while Plaintiff's social planning and judgment concerning real-world systems and concepts was somewhat deficient, it was still borderline as compared to normative sampling from testing.  *Id.*

Plaintiff informed Dr. Hammerly that when she was not on her medications, she stayed in bed all hours of the day.  Tr. at 376.  However, Dr. Hammerly noted that this was odd, since Plaintiff reported that she drank beer all day up until one or two weeks ago.  *Id.*  He also noted that Plaintiff

had discontinued her medications and the contraindications for her medications was alcohol use. *Id*. He indicated that Plaintiff reported sleeping a couple of hours per day, a decreased appetite and pacing. *Id*. While Plaintiff stated that her mother came over and did everything for her, including washing her dishes, laundry, cooking, cleaning and grocery shopping, Dr. Hammerly found it difficult to believe. *Id*. He noted that while Plaintiff spent a lot of time trying to convince him that her mother also paid all of her bills and tracked her household expenses, she conceded that the child support checks came in her name and the rent was in her name as well. *Id*. He further noted that Plaintiff had a driver's license and thus had passed the written test. *Id*.

In summary, Dr. Hammerly concluded that Plaintiff exhibited a maladaptive pattern of alcohol use that led to clinically significant impairment or distress in one or more important areas of functioning which was his only Axis 1 diagnosis for Plaintiff. Tr. at 377. He noted that while Plaintiff complained of mood and anxiety problems, these were too closely tied to her alcohol abuse to be identified as separate diagnoses at the current time. *Id*. He assigned a global assessment of functioning ("GAF") score of 61-70 due to alcohol abuse and a final GAF of 61 due to her lower mild range of functioning in symptom severity and functional capacity. *Id*. at 378. Dr. Hammerly diagnosed Plaintiff with alcohol abuse and found that she suffered no impairments in understanding, remembering and following instructions or in maintaining attention, concentration, persistence and pace, and mild impairments in relating to others, including co-workers and supervisors, and in withstanding the stress and pressures associated with daily work activities. *Id*. at 379.

Plaintiff presented to APRN Dewey at Harbor on January 14, 2010 for medication management and she reported that she had been off of the medications for the past month and had noticed a difference. Tr. at 345. Plaintiff reported that she was sleeping better when she was taking Trazadone and without the medications, she was isolating herself more, she was more depressed, and she had racing thoughts, insomnia, anxiety, and irritability. *Id*. A mental status examination yielded no abnormalities and Plaintiff was agreeable to restarting her medications. *Id*. at 345-346. She was restarted on Celexa, Trazadone, and Vistaril, and the Risperdal was changed to Invega. *Id*. at 346.

On January 15, 2010, Plaintiff presented to Ms. Paul.  Tr. at 349.  Plaintiff explained how her anger increased and she would lose control of her behavior and she could not explain why her anger escalated.  *Id*.  She denied homicidal and suicidal ideations. *Id*.  Plaintiff was referred to an anger management group and agreed to continue her medications and individual therapy.  *Id*.

On February 5, 2010, Dr. Shapiro, Ph.D. reviewed Plaintiff's records and completed a psychiatric review technique form and mental RFC assessment of Plaintiff.  Tr. at 382-398.  In the psychiatric review technique form, Dr. Shapiro reviewed Plaintiff's case on the basis of Listing 12.04 for affective disorders for her diagnosis of major depression and Listing 12.09 for substance addiction disorders due to her alcohol abuse.  *Id*. at 382-390.  Dr. Shapiro opined that Plaintiff had moderate limitations in her activities of daily living due to her mental disorders, mild limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace, and no episodes of decompensation of an extended duration.  *Id.* at 392.  On the mental RFC assessment, Dr. Shapiro opined that Plaintiff was not significantly limited in any of the understanding and memory categories or in a number of the sustained concentration and pace, social interaction and adaptation categories, but she was moderately impaired in: maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance and being punctual; completing a normal workday or workweek without interruptions from psychologically-based symptoms and performing at a consistence pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and in responding appropriately to changes in the work setting.  *Id.* at 396-397.

In support of his opinion that Plaintiff could sustain simple and some complex tasks that are relatively static and involve only superficial social contacts, Dr. Shapiro cited Dr. Hammerly's skepticism as to some of Plaintiff's statements, the fact that Plaintiff worked for two years and lost her job from downsizing with no reports that she could not handle the work or demands of the job, and Plaintiff's lack of compliance with her medications, her drinking of alcohol and her inconsistent attendance at counseling.  Tr. at 398.

-8-

On February 12, 2010, Plaintiff presented to Ms. Paul for counseling. Tr. at 350. Ms. Paul found Plaintiff's mood/affect to be flat and Plaintiff told Ms. Paul that she had to take on adult responsibilities at a young age as she was the oldest child and her mother took in eight of Plaintiff's cousins to raise, so Plaintiff was frequently left in charge of the other children. *Id*. Plaintiff also related that her mother arranged for her to be married at the age of 16 and she had her first child within that year. *Id*. She stated that her anger stemmed from feeling as if she missed having a childhood. *Id*. Plaintiff recognized the need to control her anger. *Id*.

Plaintiff presented to Ms. Paul on April 19, 2010 for counseling and reported problems controlling her anger as she had gone to her girlfriend's apartment at 3:00 a.m. angry because her girlfriend did not repay money that Plaintiff lent her for rent and Plaintiff threw two televisions across the room, breaking them, and tried to grab her girlfriend's cell phone from her hand and her girlfriend bit her on the hand. Tr. at 351. Plaintiff related that she had thoughts of suicide by overdosing on Percocet and Motrin on April 17, 2010 after she was given these medications at the hospital for the bite on her hand. *Id*. Plaintiff then thought about raising her sons and her suicidal thoughts dissipated. *Id*.

On April 28, 2010, Plaintiff met with Ms. Paul and reported progress with managing her anger. Tr. at 352. She indicated that she experienced a lot of stress from raising her three sons with no help from their father and from helping her mother who was raising a newborn and three other children of her brother. *Id*. Plaintiff believed that her life stressors contributed to her anger. *Id*.

Plaintiff presented for medication management with APNR Krieger and reported that she had anger issues and had run out of her medications. Tr. at 353. It was noted that Plaintiff had compliance issues. *Id.* Her mental status examination was normal. *Id*. at 354. Plaintiff's Celexa, Trazadone, Risperdal and Vistaril were restarted and injections of Risperdal were discussed. *Id*. at 355.

On June 8, 2010, Plaintiff presented for medication management and received a Risperdal Consta injection. Tr. at 357. No abnormalities were noted on mental status examination. *Id.* at 358.

On June 24, 2010, Plaintiff presented for medication management and reported that she was not sleeping due to repetitious and racing thoughts. Tr. at 361. She stated that she felt no different

from the Risperdal injection but she was willing to continue with it. *Id.* APRN Krieger increased Plaintiff's Risperdal tablet dosage. *Id.* at 363. Plaintiff received a Risperdal injection on June 24, 2010 as well. *Id.* at 365.

On July 12, 2010, Plaintiff presented for medication management and reported continuing trouble with racing and repetitive thoughts preventing her from sleeping. Tr. at 368. She related that she still experienced anger issues but was better able to control them with no physical acting out behavior. *Id.* She reported that she thought the medications were helping her. *Id.*

On July 21, 2010, Plaintiff met with Ms. Jones at Harbor, who helped her complete social security forms. Tr. at 422. Ms. Jones noted that Plaintiff was anxious and had to be redirected several times because she did not understand the process. *Id.*

On July 26, 2010, Plaintiff presented to Harbor for medication management and reported she thought the medications were helping but she still had trouble sleeping and with her mind racing all of the time. Tr. at 423. She indicated that she was better able to control her anger and rages without physically acting out. *Id.* The mental status examination showed normal results, although a euthymic mood, and congruent and blunt affect were noted. *Id.* at 423-426. Plaintiff was given an increased injection dose of Risperdal. *Id.*

On August 5, 2010, Plaintiff presented to Ms. Paul for counseling, reporting feelings of anger, anxiety and sleep disturbance. Tr. at 428. She stated that she had a physical fight with an ex-boyfriend of the woman that she was seeing over the last six months. *Id.* Plaintiff desired to control her angry impulses and she asked for a medication that would help her with this. *Id.*

On August 9, 2010, Plaintiff met with Ms. Wilkins, LPN, at Harbor for medication management. Tr. at 429. Plaintiff informed Ms. Wilkins that she was doing well on the Risperdal injection but still had thoughts at night that lead her to go out and she had an on/off relationship with an ex-girlfriend. *Id.* She reported that she was trying to deal with her anger/violent impulses and she was still unable to control them. *Id.* She said that she took Elavil during her last anger episode but it took a long time to work and Nurse Wilkins explained to her that medications do not work instantly. *Id.* Plaintiff's mental status examination was normal and her medications were unchanged. *Id.* at 429-431.

-10-

On August 18, 2010, Plaintiff met with Ms. Paul by telephone and related that she was too depressed to come for therapy.  Tr. at 432.  Plaintiff explained that she and her sons were living with her mother because her home was broken into three weeks prior and she is fearful to return to the house.  *Id.*  She indicated that she was compliant with her medications.  *Id.*

On August 23, 2010, Plaintiff presented for medication management and explained to Psychiatric Nurse Prephan that the medications were helping as while she still had rageful thoughts, she was not acting on them.  Tr. at 433.  The mental status examination was normal, she was given a Risperdal injection, and her medications were continued.  *Id.* at 433-435.

On September 7, 2010, Plaintiff presented to Ms. Paul and they discussed Plaintiff's fear of returning to her apartment.  Tr. at 436.  Plaintiff requested assistance with finding housing, completing her GED and continuing higher education.  *Id.*  She was referred for help with those issues.  *Id.*  Plaintiff also had medication management with Nurse Prephan and reported racing thoughts, easy distraction and memory issues.  *Id.* at 437.  She indicated that her sleep had improved but she had fleeting suicidal thoughts but no plan.  *Id.*  The rest of Plaintiff's mental status examination was normal and her medications were continued.  *Id.* at 438-439.

Plaintiff received help with trying to secure housing .  Tr. at 441-442.  Her Risperdal injection dosage, Risperdal tablet dosage and Vistaril dosage were all increased by APRN Krieger on September 21, 2010 after Plaintiff presented complaining of not sleeping well and pacing at night.  *Id.* at 442-444.  APRN Krieger noted that Plaintiff appeared unfocused and not as stable as on her last appointment.  *Id.* at 442.  Plaintiff received the higher-dosage Risperdal injection on the same date.  *Id.* at 445.  She told Nurse Wilkins that she was going to stop pursuing the woman that caused her anger to increase and become violent and she was going to move on with her life.  *Id.*  Nurse Wilkins noted that Plaintiff's cognitive functions appeared less than baseline and her insight was poor to fair.  *Id.* at 446.

Plaintiff received therapy with Ms. Paul by telephone on September 23, 2010 as Plaintiff did not feel like coming to the office.  Tr. at 448.  She was still living with her mother and was working with client services to help apply for new housing.  *Id.*  On September 29, 2010, Plaintiff received

-11-

assistance at Harbor for completing a social security benefits packet. *Id*. at 449. Plaintiff also received assistance from Harbor on the same day in completing housing applications. *Id*. at 450.

Plaintiff received a Risperdal injection on October 5, 2010 and reported that she was still feeling depressed. Tr. at 451. Her mood was observed as sad and depressed, with a congruent, reactive flat affect. *Id*. at 451-452. Plaintiff's Risperdal injection dosage, as well as the dosages of her Risperdal tablet and Vistaril were increased. *Id*. at 453.

On October 12, 2010, Plaintiff presented to Ms. Paul with her new significant other. Tr. at 454. Ms. Paul described Plaintiff' behavior/perception as "under the influence." *Id*. Plaintiff reported that she was working with Harbor's staff to try to obtain new housing and she and her three sons were staying at her partner's house. *Id*. She also related that she felt that she had more control over her anger and her partner was helping her a lot in caring for her sons and getting them involved in afterschool activities and tutoring. *Id*.

Plaintiff was given a Risperdal injection on October 19, 2010 and also met with APRN Krieger for medication management. Tr. at 455-457. Plaintiff's friend who was with her demanded to know why Plaintiff was so sleepy and Ms. Krieger explained, after obtaining permission from Plaintiff, that her injectable medication was being adjusted which caused sleepiness. *Id*. at 457. APRN Krieger described Plaintiff's mood as sad, her affect as congruent and blunt, and her insight and judgment as poor. *Id*. at 457-458. Plaintiff's Risperdal tablet and Vistaril dosages were decreased. *Id*. at 459.

Ms. Paul met with Plaintiff, who was accompanied by her friend on November 2, 2010 for counseling and Plaintiff reported that she had moved out of her house and was staying with her mother and a friend until she and her friend could secure an apartment. Tr. at 460. She was working with Harbor to obtain an apartment. *Id*. Plaintiff also had a medication management follow-up with Nurse Prephan, who suggested a switch of her injectable medication due to her concerns about her weight. *Id*. at 461. Mental status examination showed that Plaintiff's mood was good, her affect was congruent and blunt, and her insight and judgment were poor. *Id*. at 461-462. Nurse Prephan noted APRN Krieger's order decreasing Plaintiff's Risperdal tablet and Elavil and Nurse Prephan gave Plaintiff a Risperdal injection. *Id*. at 463.

-12-

On November 8, 2010, Plaintiff presented to Harbor by phone and a representative helped Plaintiff to file an appeal of her social security denial of benefits. Tr. at 464. The representative indicated that she had to redirect Plaintiff a number of times due to her lack of understanding of the process. *Id.*

Plaintiff met with Ms. Paul on November 15, 2010 and she was withdrawn, with a flat and depressed mood. Tr. at 465. Plaintiff explained that she had just learned that she was charged with aggravated burglary, a felony, from an April 2010 altercation with a former girlfriend. *Id.* She indicated that she learned of the charge when undergoing a background check in order to obtain housing. *Id.* She felt discouraged and helpless and was not sure how this would affect her eligibility for housing. *Id.* She and her three sons were still living with her mother in a one bedroom apartment. *Id.* Nurse Prephan gave Plaintiff a Risperdal injection on the same date and Plaintiff told her that she and her girlfriend had broken up and she was not sleeping well, was hearing voices and was very depressed. *Id.* at 466. Her mood was noted as sad, with low speech volume, an abnormal tone in her voice, with auditory hallucinations and poor insight. *Id.* at 466-467.

Plaintiff met with APRN Krieger for medication management on November 16, 2010 and reported that she had fleeting thoughts of self-harm due to her living situation and the aggravated burglary charge. Tr. at 469. Plaintiff denied a suicidal plan and she was staying at an ex-girlfriend's or with her mother. *Id.* She was feeling overwhelmed and was unable to sleep. *Id.* APRN Krieger

noted that Plaintiff's mood was sad, her speech had an abnormal tone and volume, she had a congruent and flat affect with auditory hallucinations, and her insight was poor. *Id.* Plaintiff's Celexa, Rispderal injection and Risperdal dosages were increased. *Id.* at 471.

On November 29, 2010, Plaintiff presented for her Rispderal injection and Nurse Wilkins noted Plaintiff's report that she was living with her mother, her three sons and two nieces in a one bedroom apartment. Tr. at 472. Plaintiff's mood was described as sad and depressed, with a congruent and flat affect, suicidal ideations with no plan, and auditory hallucinations. *Id.* at 473.

Nurse Wilkins administered another Risperdal injection on December 15, 2010 and Plaintiff reported that she went to court and the charges against her were dismissed and she was now back

-13-

with the girl who was involved in the case.  Tr. at 475.  She indicated that she had secured an apartment and she and her sons were doing well.  *Id*.  She further reported that she was taking classes twice per week in order to obtain her GED and she wanted to find a job.  *Id*.  Plaintiff reported that she was feeling happy and she was eating and sleeping okay.  *Id*.

Plaintiff met with APRN Krieger for medication management and she reported that she was sleeping better since the increase in her Risperdal injection dosage.  Tr. at 478.  She also noted that she was not having auditory hallucinations or racing thoughts and she was eating and sleeping okay.  *Id*.  Her medications were continued.  *Id*. at 579-480.

On December 29, 2010, Plaintiff met with Nurse Prephan for an injection and she reported that she was sleeping better and while she still had "ups & downs" with her mood, she denied auditory hallucinations and rages.  Tr. at 481.  She stated that she loved her new apartment, Christmas went well, and she was eating and sleeping okay.  *Id*.  Her mood was noted as good. *Id*. at 481-482.

On January 5, 2011, LPC Tammy Harmon of Rescue Mental Health Services performed an Adult Diagnostic Assessment on Plaintiff upon Plaintiff's voluntary presentment there.  Tr. at 484.  Plaintiff presented reporting that she had been taking medications for over a year through Harbor and she was experiencing fleeting suicidal thoughts of overdosing on her medications.  *Id*.  She indicated that voices were telling her to harm herself and she was under a lot of stress as she had three boys to care for, she was unemployed and had just recently moved and had financial strains.  *Id*.  Plaintiff reported that she was having racing thoughts, increased sleep, poor appetite and was withdrawn.  *Id*.  She also indicated that she was having difficulty performing her daily activities.  *Id*. at 484.  Plaintiff was diagnosed with depressive disorder, not otherwise specified, and rule out alcohol abuse.  *Id*. at 487.  Her current GAF was 40, indicating serious symptoms.  *Id*. at 488.  Plaintiff was noted as withdrawn, with avoidant eye contact, clear speech, no delusions, suicidal thoughts and plans, auditory hallucinations, racing thoughts, depressed mood, flat affect, and average intelligence.  *Id*. at 488-489.  Plaintiff was admitted for stabilization and medication evaluation.  *Id*.

On January 6, 2011, Dr. Gupta of Rescue performed a psychiatric evaluation of Plaintiff and noted that she voluntarily presented there after indicating that she was taking her medications regularly and was decompensating, although she did admit that she sometimes skipped doses of her medications.  Tr. at 492.  She reported racing thoughts, voices telling her to overdose, depression, and feeling overwhelmed, with poor appetite and lack of motivation.  *Id.*  Mental examination revealed that Plaintiff spoke slowly in a monotone voice, with a dysphoric mood and appropriate affect.  *Id.* Plaintiff was oriented and denied homicidal feelings or delusions, but reported that she had auditory hallucinations telling her to kill herself.  *Id*.  Dr. Gupta noted that Plaintiff's memory was fair, her intellect was average, and she had superficial judgment and partial insight.  *Id*. He diagnosed Plaintiff with schizo-affective disorder and rated her GAF at 30.  *Id.*

Plaintiff presented for medication management with Nurse Wilkins at Harbor on January 11, 2011 and explained that she went to Rescue because her sons started asking for things that she could not afford and she began feeling worthless and having auditory hallucinations because of her current financial situation.  Tr. at 500.  Plaintiff indicated that she was waiting for social security benefits and stated that she felt like she could not work at the time.  *Id*.  Mental status examination revealed that Plaintiff's mood was sad and depressed, her affect was congruent and blunt, her memory, concentration and attention were intact and her insight and judgment were fair.  *Id*. at 501.  Plaintiff was given a Risperdal Constra injection.  *Id.* at 502.  Nurse Wilkins administered a Risperdal injection on January 25, 2011 and Plaintiff indicated that she was feeling better because she had spoken to her sons about their financial situation.  *Id.* at 503.  She reported that she wanted to get her GED.  *Id*.  She also received an injection on February 8, 2011 and reported feeling better and she was getting out of her bedroom more often and was looking into GED programs.  *Id*. at 506.

When Plaintiff received her Risperdal injection on February 22, 2011, she reported that she was doing better with her depression, but she was more anxious.  Tr. at 509.  She informed Nurse Prephan that she was not getting out of the house and not going to therapy.  *Id*.  Plaintiff's Vistaril was increased.  *Id*. at 510. At her March 8, 2011 injection, Plaintiff reported that she was back to staying in her bedroom, but she was sleeping and eating okay.  *Id*. at 512.

On March 21, 2011, Plaintiff presented to APRN Krieger for medication management.  Tr. at 515.  She reported that her mood was better, but she wanted to try a new medication for anxiety, so they agreed on trying Buspar and discontinuing Vistaril.  *Id.*  APRN Krieger noted that Plaintiff appeared calm and focused and she believed that the medications were working.  *Id.*  At 515-517. At her April 4, 2011 Risperdal injection, Plaintiff reported to Nurse Wilkins that the Buspar was helping her anxiety and she was checking into starting classes at Liberty College, both for her GED and for college courses.  *Id.* at 521.

On April 20, 2011, Plaintiff met with APRN Krieger for her injection and for discussion about weaning her off of the oral Risperdal.  Tr. at 524.  Plaintiff reported that her mood was good with some anxiety, and she was sleeping well.  *Id.*  Her Risperdal oral dosage was reduced slightly. *Id.* at 526.

Plaintiff reported to Nurse Wilkins at her injections in May of 2011 that she had no energy or motivation and she was feeling more depressed and staying in her room.  Tr. at 533.

On June 1, 2011, APRN Krieger met with Plaintiff and Plaintiff reported that she was feeling better, but her mood was up and down and she still had anxiety and had trouble sleeping.  Tr. at 536. Plaintiff was requesting to "come off the injection" but APRN Krieger declined to do so because she believed that Plaintiff was improving in her stability.  *Id.* She modified Plaintiff's Buspar and Elavil dosages.  *Id.* at 537-538.  At her June 21, 2011 injection, Plaintiff told Nurse Wilkins that the school called and told her that it was offering classes that she was interested in and she was excited to start GED classes.  *Id.* at 542.  She related that her mood was better with the recent medication changes, but home life was harder because her boys were home from school for the summer and bored. *Id.* At her July 6, 2011 injection, Plaintiff brought in two of her sons and she was smiling and interacting well with them.  *Id.* at 545.  She reported that she could not take the GED classes because she had to pay for the classes.  *Id.*  She indicated that she was still staying in her room, but her boys said that they could get her out of her room when they asked her to watch a movie.  *Id.*

At her August 3, 2011 injection, Plaintiff reported that she was trying to spend more time with her sons and her family was getting her out of her room more.  Tr. at 551.  She expressed

-16-

interest in getting back into therapy.  *Id*. At her August 17, 2011 injection, Plaintiff brought her mother and her three sons and Nurse Wilkins reported that they "all seem happy together."  *Id*. at 554.  Plaintiff indicated that when her sons returned to school, she was going to see about going back to school herself.  *Id*.

APRN Krieger saw Plaintiff on August 22, 2011 for medication management and Plaintiff reported that her medications were working well.  Tr. at 557.  They discussed decreasing the oral Risperdal and the Buspar, which APRN Krieger did.  *Id*. at 557-559.  Plaintiff reported on August 31, 2011 to Nurse Wilkins that she was doing well and her sons were back in school.  *Id*. at 560.

Plaintiff reported nausea from using Buspar and she and APRN Krieger discussed trying another medication.  Tr. at 573.  Plaintiff asked again about stopping injections, but APRN Krieger told her that she was more stable with the injections, but agreed to decrease the dose.  *Id*.  APRN Krieger decreased Plaintiff's Celexa and Risperdal dosages and discontinued the Buspar.  *Id*. at 574.  Plaintiff's GAF was rated at 65.  *Id*.

On November 30, 2011, Plaintiff met with Harbor's services relating to career development.  Tr. at 582.  Plaintiff related that she had educational barriers, but wanted to complete her GED and find a job.  *Id*.  Plaintiff had also reported to Nurse Wilkins that she was feeling anxious and pacing, even with the introduction of Propranolol as a new medication.  *Id*. at 576-586.

In December of 2011, Plaintiff reported to Nurse Wilkins that the stress in her life had decreased because she was feeling less anxious.  Tr. at 587.  APRN Krieger discontinued Plaintiff's Propranolol, decreased her oral Risperdal and Celexa, and continued the Risperdal Consta injection, and Elavil. *Id*. at 589-592.

Plaintiff continued with her medication management and on February 15, 2012, she reported that she was doing well and she was smiling and in good spirits.  Tr. at 599.  She had no problems with compliance and stated that her thoughts were clear and she denied any concerns.  *Id*.  On February 29, 2012, Plaintiff reported feeling down but not she was not sure why.  *Id*. at 601.  She admitted fleeting suicidal thoughts with no plan, but did not want her medications adjusted.  *Id*. On March 14, 2012, Plaintiff reported still feeling a bit down, but denied suicidal thoughts and did not want her medications adjusted as she thought her feelings would resolve on their own.  *Id*. at 604.

-17-

At her medication management appointment on March 28, 2012, Plaintiff reported that she was doing about the same and she indicated that she had a lot of personal stress in her life that she did not want to discuss. Tr. at 606. She indicated that she wanted to adjust her medications and she was put back on Vistaril. *Id*. at 606-607.

Plaintiff presented to APRN Krieger on April 11, 2012 and reported that things were going on and she was feeling down and not sleeping. Tr. at 611. She indicated that she did not turn in necessary paperwork in a timely fashion and her food stamps were terminated. *Id*. She agreed to modification of her medications and APRN Krieger added Paxil, decreased the Celexa and increased the dosage of Elavil. *Id.* at 615. Plaintiff reported at her April 25, 2012 appointment that she never started Paxil because her pharmacy never received the prescription. *Id*. at 616. Plaintiff noted that an incident with her sons that had been pending and causing her anxiety and stress was about to be closed so she was relieved. *Id*. She stated that she continued to isolate herself and the Visiting Nurse told her that she had to start Paxil today and give it time to work. *Id*.

On May 9, 2012, Plaintiff returned to therapy with Ms. Paul after two years. Tr. at 619. Plaintiff reported that she was angry, but she could not identify the source of her anger. *Id.* She also reported restlessness and impulses to get out of bed, get in her car and go to select places to confront others. *Id*. She complained of having no income to buy her sons things that they need like clothing. *Id.* Ms. Paul described Plaintiff as having a flat affect and limited insight. *Id*. At her medication management appointment on May 9, 2012, Plaintiff reported feeling increased anger after starting Paxil. *Id.* at 620. She reported no side effects from her medications except for the increased anger and it was noted that she was smiling more easily than at previous appointments. *Id*. They discussed discontinuing Paxil and adding Prozac, which APRN Krieger ordered. *Id*. Plaintiff's mood was described as good, but her insight and judgment were poor. *Id*. at 621.

On May 25, 2012, Plaintiff met with APRN Krieger for medication management. Tr. at 630. She reported that her medications were working well and she felt better with the change from Paxil to Prozac. *Id*. Also on May 25, 2012, APRN Krieger completed a Medical Source Statement concerning the nature and severity of Plaintiff's impairments. *Id*. at 623. She opined that Plaintiff would be able to remember, understand and follow directions for simple tasks less than 2/3 of the

-18-

time, explaining that Plaintiff had difficulty with following through, her comprehension was slow and poor at times and she frequently needed directions repeated. *Id*. APRN Krieger further opined that Plaintiff could maintain attention and concentration for two-hour periods less than 2/3 of the time because she lost focus frequently and had difficulty staying on task. *Id*. She further concluded that Plaintiff's symptoms impaired her pace severely as she would have difficulty keeping a steady pace and her productivity would be very questionable and would be more than 25% less productive than an unimpaired worker. *Id*. at 624. APRN Krieger opined that Plaintiff would miss work, would be late or would have to leave work early more than three times per month because she isolated herself and stayed in bed frequently when she was depressed or anxious, which would interfere with her ability to maintain a good attendance record. *Id*. She further concluded that Plaintiff was unable to consistently interact with others in a manner appropriate to customer expectations and would not be successful in working with the public, would be distracted by co-workers or would be distracting to them frequently, and would have emotional outbursts directed toward co-workers or supervisors at least more than once every other month. *Id.* She further opined that Plaintiff would not be able to withstand the stresses and pressures of routine simple unskilled work as she had a history of anxiety/panic attacks that would interfere with her ability to handle stress and she would be successful only in a sheltered environment. *Id.* at 625. Finally, APRN Krieger concluded that Plaintiff would not be able to work at this time because she was tearful, anxious around unfamiliar people/places, and would most likely decompensate and isolate herself more if she felt threatened in a work environment. *Id*.

On June 27, 2012, Plaintiff presented for medication management and stated that she was still depressed and was intermittently hearing voices, but it was getting better after her last injection. Tr. at 636. She was given her injection. *Id*. at 638. She was also given an injection on July 11, 2011 and reported that she was isolating more and was more depressed and hearing voices telling her to jump in front of a car. *Id*. at 639. She said that she distracted herself from the voices by thinking about her sons. *Id*. Her GAF was 55, indicative of moderate symptoms. *Id*. at 641. On August 8, 2012, Plaintiff presented for a medication visit and was smiling and reported doing "ok." *Id.* at 644. She indicated that her sleep was interrupted by nightmares in which she dreams about

fighting people and someone coming into her house and shooting her. *Id*. She indicated that she was sleeping less than 6 hours per night and had a social security hearing coming up soon. *Id*. She reported that the voices that she was hearing had decreased but she still heard them at times. *Id*.

Plaintiff presented for her injection on August 12, 2012 and reported feeling depressed. Tr. at 633. She was a week late for her injection and the nurse explained that this delay may be the reason for her depression. *Id*. Plaintiff reported not doing much during the day and being bored, she denied hearing voices, and she said her sleep and appetite were good. *Id*. Mental examination was normal. *Id*. at 634. At her August 27, 2012 injection, Plaintiff reported that she was still depressed and was hearing voices, but no as much as before. *Id*. at 636.

## VI.    **HEARING TESTIMONY**

At the hearing, Plaintiff's counsel indicated that they wished to amend Plaintiff's onset date to September 29, 2009. Tr. at 39. Plaintiff testified that she was 34 years old and completed up to the ninth grade of high school as she dropped out of school when she got married. *Id*. at 40. She has three children, a 16 year old, a 13 year old and a 10 year old. *Id*. at 48.

According to her testimony, the longest job that Plaintiff held was as a porter at a car dealership where she washed cars. Tr. at 40-41. She testified that she could no longer work because she was depressed and could not go out of her house, which began in 2008. *Id*. at 42. She explained that she was on medications and receiving treatment, but she was still depressed. *Id*. at 44. She reported that Risperdal injections helped her mind to stop racing as much and reduced her explosive outbursts, which she used to have much more often than the once a month that she was having them now. *Id*. at 44-45. She stated that Elavil and Prozac helped with depression and suicidal thoughts and she noticed a difference when she did not take them. *Id*. at 45. She also noted that she took Vistaril for anxiety, which helped at times with panic attacks and pacing. *Id*. at 45-46.

Plaintiff testified that her anxiety would affect her ability to work because it would be hard for her to focus and complete a task. Tr., at 46. She also explained that she has problems being around other people and would be distracted around them. *Id*. at 47. She also discussed her depression, indicating that three to four times a week she cannot get out of bed and does not shower or do anything. *Id*. She explained that her mother comes over almost every day and when she needs

-20-

help, she stays to help her.  *Id.* at 48.  She indicated that her mother goes with her when she does leave the house.  *Id.* at 49.  Plaintiff also reported that she has problems meeting deadlines, even to complete forms, as she gets so depressed that she just cannot do it.  *Id.* at 51.

The ALJ questioned Plaintiff, and she reported that the side effect of her medications was that they made her sleepy.  Tr. at 52.  Plaintiff also explained that she was unable to get her GED because her depression would not allow her to go and complete the classes.  *Id.* at 53.  She also indicated that she was still helping her mother take care of her one year old, two year old and three year old nieces and nephews when her depression would allow.  *Id.*

When asked whether she could work at a job where she would be relatively isolated from people on a full-time basis, Plaintiff answered that her depression would not allow her to do so.  Tr. at 54-55.  When asked whether she thought therapy at Harbor was helping, Plaintiff reported that sometimes she thought that it did and other times she did not think so.  *Id*. at 55.

The VE then testified.  Tr. at 56.  The ALJ asked the VE to assume a hypothetical individual with the same age, education and work experience as Plaintiff, with no exertional impairments, but limitations to performing simple, routine, repetitive tasks in a work environment free from fast-paced production requirements, simple work-related decision-making, few changes in the workplace, and no interpersonal interaction with the general public and no more than occasional and non-intensive interaction with co-workers and supervisors.  *Id.* at 58.  The ALJ asked the VE whether such a hypothetical person could perform any of Plaintiff's past relevant employment and the VE responded that such a person could perform Plaintiff's past relevant work as an automobile detailer. *Id.*

The ALJ referred to APRN Krieger's statement that Plaintiff would be able to stay on-task less than two-thirds of the time and asked the VE about off-task limitations in employment.  Tr. at 59.  The VE responded that an off-task limitation of one-third of the workday would exceed normal work tolerances and such a person could not perform full-time competitive employment on a sustained basis.  *Id*.

Plaintiff's attorney questioned the VE, modifying the ALJ's hypothetical individual to also include an absence of more than three times per month from employment, or that the individual

would be late or leave early more than three times per month. Tr. at 60. The VE responded that this limitation exceeded normal work tolerances and such a person would be unable to perform full-time competitive work on a sustained basis. *Id*.

## VII.   LAW AND ANALYSIS

Plaintiff asserts that the ALJ erred in his treatment of APRN Krieger's medical source statement as he gave little weight to her opinion and instead gave significant weight to the opinions of the agency one-time consultative examiner and state agency reviewing psychologists. ECF Dkt. #18 at 15-23.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). On the other hand, "[o]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The ALJ will evaluate every medical opinion received regardless of its source, and if he or she does not attribute controlling weight to a treating medical source, a number of factors will be evaluated in order to determine the weight to give to the medical opinion, including the examining relationship, specialization, consistency, and supportability. *Id.* citing  20 C.F.R. §416.927(c). Other factors "which tend to support or contradict the opinion" may also be considered in assessing any type of medical opinion. *Id.*

APRN Krieger as a nurse practitioner is considered an "other source" and not an "acceptable medical source" under the Social Security Regulations. *See* 20 C.F.R. §§ 416.923(a)(d). Although information from "other sources" cannot establish the existence of a medically determinable impairment, their information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Social Security Ruling ("SSR") 06-03p . SSR 06-03p discusses opinion evidence from "acceptable medical sources" and from "other sources" and highlights the importance of some "other sources," such as nurse practitioners:

> These regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 CFR 404.1513(d) and 416.913(d). With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p.

In evaluating the opinions of "other sources" who have seen the claimant in a professional capacity, the ALJ should consider how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment.  SSR 06-03p; *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007).  SSR 06–03p further provides that ALJs "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p.

The Court notes that the standard of review is whether the ALJ complied with the proper legal standards and whether substantial evidence supports his determination, even if substantial evidence supports a finding to the contrary.  Based upon this standard, the Court finds that the ALJ properly applied the correct legal standards and substantial evidence supports the weight that he gave to APRN Krieger's medical source statement and to the opinions of the state agency psychologists.

The ALJ correctly referred to SSR 06-03p in his decision and found that APRN Krieger was not an acceptable medical source under the Social Security Regulations.  Tr. at 27.  He considered APRN Krieger's May 25, 2012 medical source statement and explained that he attributed it only little weight because Plaintiff's counsel reported that Plaintiff saw APRN Krieger only once every

-23-

2-3 months, the statement was inconsistent with APRN Krieger's treatment notes completed on the same day as the statement, and the statement was made on a checkmark form that he found entitled to little weight in the adjudicative process.  *Id*.

Plaintiff finds fault with all of the ALJ's cited reasons for the weight that he attributed to APRN Krieger's opinion.  She first asserts that although APRN Krieger is not an acceptable medical source, the ALJ could still have given significant weight to that opinion because APRN Krieger essentially played the role of treating psychiatrist in Plaintiff's care.  ECF Dkt. #18 at 15-16.

Plaintiff is correct that the ALJ could have attributed significant weight to APRN Krieger's medical source statement.  However, the Court finds that the ALJ was aware that he could have attribute more weight to APRN Krieger's statement since he cited to SSR 06-03p in his decision, found that she was not an acceptable medical source and applied the proper factors in determining the weight to give to an "other source" opinion.  SSR 06-03p specifically states that the opinion from a medical source that is not an "acceptable medical source" may outweigh that of an "acceptable medical source" and it may be appropriate to attribute more weight to the medical source that is not the "acceptable medical source" under certain circumstances.  By citing to SSR 06-03p and applying the relevant factors of that Rule to APRN Krieger's medical source statement, the Court finds that the ALJ was aware of the weight that he could give to her statement and ultimately decided to give her statement little weight based upon his weighing of those factors.  Tr. at 25, 27.  Accordingly, the Court finds no merit to this assertion.

Plaintiff also complains that the ALJ's analysis failed to address the consistency of APRN Krieger's opinion with the treatment record as a whole.  ECF Dkt. #18 at 16-19.  She asserts that the ALJ erroneously confined APRN Krieger's statement to the date of May 25, 2012, the date that she drafted the statement and the date that she also issued a treatment note from Plaintiff's medication management session with her.  *Id*. at 17.  She contends that the ALJ relied only upon her May 25, 2012 treatment note to discredit APRN Krieger's medical source statement when treatment notes throughout Plaintiff's history at Harbor from 2009 showed repeated adjustments to her medications and varying degrees of improvement and setbacks.  ECF Dkt. #18 at 16-19.  She asserts that APRN

-24-

Krieger's medical source statement was an opinion concerning Plaintiff's symptoms over time and considered Plaintiff's ability to perform competitive employment on a full-time basis, which the ALJ failed to consider. *Id.*

While the ALJ did cite specifically to APRN Krieger's treatment note of May 25, 2012 in the section of his decision addressing the weight that he attributed to her medical source statement, the ALJ also cited to a host of other treatment notes in the beginning section of his Step Four analysis. Tr. at 25-27, citing Tr. at 331-346, 354, 358, 362, 423-426, 430, 433-434, 437-438, 452, 466, 469, 475-484. He reviewed treatment notes from Harbor beginning in 2009 and continuing throughout Plaintiff' 's treatment history in 2010, 2011 and 2012. *Id.* He cited to treatment notes throughout this time period where Plaintiff complained of not doing well and experiencing auditory hallucinations. *Id.* However, he also noted that the mental status examinations over the years consistently showed that Plaintiff had intact memory, attention and concentration, Plaintiff reported that her auditory hallucinations were decreasing with her medications, and her symptoms improved and she became stable on medication but for situational stressors such as ending a relationship, issues with her three sons, unemployment, having to move and skipping doses of her medications. *Id.* The ALJ indicated that after her diagnosis with a schizoaffective disorder and adjustments to medications, Plaintiff generally showed normal mental status examinations in 2011 and 2012 and she reported improvement in her mood and symptoms as evidenced by treatment notes. *Id.* at 26, citing Tr. at 501, 504, 506-507, 509-510, 513, 515-525, 530-531, 542-543, 545-551, 554-555, 557-558, 560-561, 567-568, 594-599, 627-628, 630-631. The ALJ also cited to the last treatment notes in the file which indicated that Plaintiff was smiling easily, had a normal mood, intact memory, attention and concentration, and she reported that her auditory hallucinations had decreased, although she still reported some depression and anxiety, isolating socially and having panic attacks and explosive outbursts. *Id.* at 26, citing Tr. at 626-647. The ALJ accommodated these symptoms by limiting Plaintiff to simple, routine and repetitive tasks, in a low-stress work environment with limited interpersonal interaction. *Id.* at 26.

The ALJ also correctly noted that APRN Krieger's treatment notes dated May 25, 2012, the same date as the medical source statement, indicated that Plaintiff's medications were working well

-25-

with no side effects, she was eating and sleeping well, and she was less depressed. *Id*. at 630-631. APRN Krieger's mental status examination indicated that Plaintiff was in a good mood and was smiling, her memory, attention and concentration were intact, and she denied auditory and visual hallucinations. *Id*. at 631. She did note that Plaintiff's insight and judgment were poor at this visit, although she did not explain why. *Id*. Nevertheless, the ALJ is correct that APRN Krieger's treatment notes did not correspond to the extreme restrictions that she checked on the medical source statement form that she completed. Plaintiff also had a Rispderal injection on that date and the nurse administering the injection found that Plaintiff reported feeling depressed and the nurse explained that it may be because Plaintiff was late in coming in for this injection. *Id*. at 633. The nurse also reported that Plaintiff told her that she was "bored" all day as she did not do much during the day and she denied hearing voices and reported that her appetite and sleep were good. *Id*. The nurse found that Plaintiff's memory, attention and concentration were intact, and her insight and judgment were fair. *Id*. at 634.

The ALJ additionally reviewed the opinions of the agency reviewing and consulting psychologists and attributed those opinions significant weight. Tr. at 26-27. Plaintiff takes issue with the weight given to those opinions, asserting that these opinions were made in early 2010, well before APRN Krieger's medical source statement and Plaintiff's lengthy treatment with Harbor. ECF Dkt. #18 at 22-23. The ALJ gave significant weight to the opinions of the agency reviewing psychologists who reviewed the medical record and found that Plaintiff was mildly to moderately limited in her activities of daily living, maintaining social functioning and in maintaining concentration, persistence or pace. Tr. at 27. While Plaintiff challenges the ALJ's reliance on said opinions since they were issued in 2010 and therefore did not consider APRN Krieger's May 25, 2012 opinion and all of her subsequent treatment notes for review, the psychologists did have treatment notes from Harbor through 2010 and mental status examinations from APRNs at Harbor during that time period when Plaintiff first restarted treatment and was adjusting to medications. *Id*. at 398. Dr. Shapiro, who issued an agency reviewing psychologist opinion on February 5, 2010, cited to treatment notes from Harbor which showed "no major mood/cognition/concentration or thinking problems" and subsequent treatment after taking most of her prescribed medications which

-26-

showed improvement in all areas but delusions, which were a result of not taking some of her medications. *Id*. Dr. Hammerly, who issued a report upon examination of Plaintiff admittedly in 2010 before extensive treatment at Harbor, found her at most mildly impaired in some areas. *Id*. at 379. These psychologists are highly qualified experts under the Social Security Regulations and they are specialists in mental health issues. 20 C.F.R. § 416-927(e)(2)(i). Moreover, the fact that the ALJ gave these opinions significant weight does not detract from or negate his ability to give APRN Krieger's medical source statement significant weight if he had found that it was supported by and consistent with the evidence of record. Yet the ALJ did not do so and substantial evidence supported his decision not to do so.

In addition to reviewing the medical evidence of record, the ALJ also properly considered Plaintiff's credibility as to the nature and severity of her impairments, and he found that her credibility was somewhat damaged because she had engaged in a number of activities that undercut the severity and limiting effects of her impairments, such as cooking, driving, shopping, caring for her three children and helping her mother care for her brother's three children, and attending GED classes. Tr. at 26. These activities detract from Plaintiff's statements of severe and disabling impairments and detract from APRN Krieger's medical source statement finding the most severe and limiting of restrictions.

Based upon the ALJ's decision and the record, the Court finds no merit to Plaintiff's assertions that the ALJ erred in his analysis of APRN Krieger's medical source statement, the ALJ's decision failed to address the consistency of her statement with the treatment record as a whole, or the assertion that the ALJ should not have given the agency psychologists' opinions significant weight.

Plaintiff also complains that the ALJ failed to place adequate attention on the length of the treatment relationship between Plaintiff and APRN Krieger. ECF Dkt. #18 at 19. This is one of the factors that an ALJ considers in determining the weight to give to a medical source. 20 C.F.R.§ 416.927(c)(i). The ALJ did not explicitly articulate the length of the relationship between Plaintiff and APRN Krieger in his decision. However, he reviewed the treatment notes from Harbor from 2009 through 2012, which included APRN Krieger's treatment notes. And he discussed those notes

and APRN Krieger's medical source statement. Thus, while he did not explicitly state that he considered the length of their treatment relationship, APRN Krieger's treatment notes from 2010 through 2012 were before him in the record and he reviewed those records. Accordingly, the length of the treatment relationship was before him and reviewed.

Plaintiff further challenges the ALJ's statement in his decision that he was attributing little weight to APRN Krieger's medical source statement because it was completed on a checkbox form. ECF Dkt. #18 at 20. The ALJ cited this as one reason for the weight he attributed to her statement and cited to a case from the Eighth Circuit which held that an ALJ permissibly rejected three psychological evaluations '"because they were check-off reports that did not contain any explanation of the base of their conclusions."' Tr. at 27, quoting *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996). Plaintiff asserts that in this case, APRN Krieger did not simply check boxes as she provided explanations for each of the restrictions that she opined. ECF Dkt. #18 at 20, citing Tr. at 623 -625. The Court agrees that APRN Krieger did provide some reasoning for her findings, although Defendant questions the usefulness of such reasons, arguing that they are not supported by the Harbor treatment notes and asserting that some of APRN Krieger's "explanations" are mere conclusions and fail to provide insight into why Plaintiff required the most severe of the limitations. However, the Court finds that even if the ALJ committed error in providing this finding as a reason to attribute little weight to the medical source statement, this is harmless error because the ALJ provided other adequate reasons for the weight that he attributed to APRN Krieger's medical source statement, as discussed above.

## VIII.   CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's case with prejudice.

DATE: May 7, 2015

                                  */s/George J. Limbert*
                                    GEORGE J. LIMBERT
                                    UNITED STATES MAGISTRATE JUDGE